UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                          :
SUSAN SIEGEL,                             :
                                          :   CASE NO. 1:09-CV-01791
            Plaintiff,                    :
                                          :
       v.                                 :   OPINION & ORDER
                                          :   [Resolving Doc. No. 34.]
INVERNESS MEDICAL                         :
INNOVATIONS, INC.,                        :
                                          :
            Defendant.                    :
                                          :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendant Inverness Medical Innovations, Inc. has moved for summary judgment in this federal and state law age and gender employment discrimination action. [Doc. 34.] For the following reasons, the Court GRANTS IN PART and DENIES IN PART Inverness's motion.

**I. Background**

Plaintiff Susan Siegel, a medical diagnostic products sales representative for Inverness since 2003, filed this disparate-treatment action against her former employer, who terminated her in its 2007 workforce reduction in the wake of several corporate acquisitions. [Doc. 1.]

Siegel, 51 years old at the time of her discharge, claims that Inverness used its workforce reduction to retain less qualified male and younger female employees. [Doc. 1 at ¶¶ 7, 9, 12, 13.] Specifically, Inverness's workforce reduction entailed reorganizing its sales force into two groups: one that sold to hospitals and clinics and one that sold to doctors' offices and labs. [Doc. 34-1 at 2-3.] Inverness retained Tracy Kromalic (F, 44 years old in 2007) as its sales representative for the

Case No. 1:09-CV-01791
Gwin, J.

hospital sales group in Siegel's former territory. [Doc. 34-1 at 3.] And in the labs sales group, Inverness retained Michael Deckard (M, 26), Kristin McGinness (F, 37), and Ben Liptak (M, 34). [Doc. 34-1 at 3.]

Inverness contends that it retained these employees instead of Siegel for legitimate, nondiscriminatory reasons. In particular, Inverness claims it retained Kromalic over Siegel because of Kromalic's superior distributor relationships, more advanced technical knowledge, and greater willingness to travel and work full-time. [Doc. 34-1 at 3.] Inverness says it kept Deckard, McGinness, and Liptak for the labs sales group because of their experience selling to labs; Siegel had no such experience. [Doc. 34-1 at 3.]

Inverness now moves for summary judgment. [Doc. 34.]

## II.  Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving plaintiff. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

## III.  Siegel's Disparate-Treatment Claims

The governing law in disparate-treatment cases like this one is the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Case No. 1:09-CV-01791
Gwin, J.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802-04); *accord Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131-32 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112.").

### A. Prima Facie Case

Ordinarily, to make out a prima facie case of discrimination—the first step of the *McDonnell Douglas* analysis—a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) she was replaced by someone outside the protected class. *See, e.g.*, *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 69 (6th Cir. 1982) (ADEA context). But in the context of a workforce reduction, that standard would allow *every* protected employee discharged in the reduction to establish a prima facie case—and the consequent "'legally mandatory, rebuttable presumption' that the defendant discriminated" against her. *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1464 n.7, 1465 (6th Cir. 1990) (quoting *Burdine*, 450 U.S. at 254 n.7). Thus, in reduction-in-force cases, the Sixth Circuit requires the plaintiff to show, besides the four ordinary prima facie elements, "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* at 1465.

Here, Inverness does not contest the four ordinary prima facie elements, but it contends that a reasonable jury could not find for Siegel on the additional "singling out" element. [Doc. 34-1 at 4-8.] Inverness argues—and Siegel does not dispute—that Siegel has no "direct" evidence that Inverness singled her out because of her age or gender. *Barnes*, 896 F.2d at 1465. [Doc. 34-1 at 4;

Case No. 1:09-CV-01791
Gwin, J.

Doc. 56 at 9-14.]

But Siegel points to "statistical" evidence that "tend[s] to indicate that [Inverness] singled out [Siegel] for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465. The report of Siegel's expert, Dr. Chieh-Chien Bowen, concluded that Inverness's workforce reduction of 143 employees disproportionately discharged women and older employees. [Doc. 47-2.[1]/] In particular, Dr. Bowen's report found that Inverness laid off women at more than double the rate of men, employees over 40 at nearly double the rate of employees under 40, and women over 40 at more than double the rate of everyone else. [Doc. 47-2.] Dr. Bowen calculated the Chi-Square statistics for these comparisons and concluded that the actual number of layoffs from these protected groups were at least two standard deviations from the results expected if gender or age played no role in Inverness's decisions. [Doc. 47-2.] These statistics suggest that gender and age played a role in Inverness's workforce reduction. *See Barnes*, 896 F.2d at 1466-68; *see generally Castaneda v. Partida*, 430 U.S. 482, 497 n.17 (1977) ("[T]he statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value. . . . As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.").[2]/

---

[1]/Inverness attacks Dr. Bowen's second expert report as untimely. [Doc. 47.] However, the statistical evidence in Dr. Bowen's first report (which Inverness concedes was timely) is sufficient to establish Siegel's prima facie case on summary judgment.

[2]/By providing statistical evidence across Inverness's entire workforce reduction, Siegel has distinguished this case from the cases cited by Inverness in which a plaintiff failed to establish a prima facie case merely by pointing to an equally qualified member outside the protected class whom the employer retained. *See, e.g., Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 266-67 (6th Cir. 2010); *Adams v. Proto Plastics, Inc.*, 151 F. App'x 468, 469-70 (6th Cir. 2005) (unpublished).

-4-

Case No. 1:09-CV-01791
Gwin, J.

Inverness advances three counterarguments to Dr. Bowen's report. First, Inverness argues that the Supreme Court's post-*Barnes* decision in *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003), precludes use of disparate-*impact* statistics (like Dr. Bowen's report) in a disparate-*treatment* case (like this one). In *Raytheon*, after the plaintiff had established a prima facie case of disparate treatment, the court of appeals turned to the second step of the *McDonnell Douglas* framework. *Id.* at 49-51. The court of appeals concluded that because the employer's proffered reason for refusing to rehire the plaintiff disproportionately affected a protected class (a factor that pertains to disparate-impact claims but not disparate-treatment claims), that reason was not legitimate or nondiscriminatory and thus could not rebut the plaintiff's prima facie case. *Id.* at 50-52. The flaw in this reasoning, the Supreme Court explained, was that the disproportionate *effect* of the employer's proffered reason on a protected class was irrelevant to whether the reason was *facially neutral* towards that class—the proper inquiry at the second step of a disparate-treatment claim. *Id.* at 53-55. In short, *Raytheon* held that the court of appeals asked the wrong question at *McDonnell Douglas*'s second step—not, as Inverness contends, that the court of appeals looked at impermissible evidence.

Here, by contrast, Siegel's disparate-impact statistics are relevant to her disparate-treatment prima facie case because they tend to eliminate the most plausible nondiscriminatory reasons for the poorer position of the protected classes of which she is a member. As the Sixth Circuit explained:

> Since all of the discharged employees are arguably qualified in work force reductions, the most obvious explanations for the discharge of any one employee are lower proficiency and/or random chance. Since it is reasonable to presume at this stage of the case that skill is distributed randomly over any given . . . group and since the plaintiffs have shown that the results depart significantly from those that chance alone would predict, we believe that the statistics, on their face, establish a prima facie case of discrimination.

Case No. 1:09-CV-01791
Gwin, J.

*Barnes*, 896 F.2d at 1466.[3] Thus, the Sixth Circuit concluded, "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant *discriminated against individual members* of the class"—the proper question at the prima facie stage of a disparate-treatment claim. *Id.* at 1466 (emphasis added).

Second, Inverness argues that Dr. Bowen's analysis used a flawed sample of employees. Inverness contends that the sample is both underinclusive (because it excludes Michael Deckard, who Siegel admits was similarly situated) and overinclusive (because it includes many employees in positions and locations not comparable to Siegel's Ohio sales position). [Doc. 34-1 at 9-10.]

But the statistics in *Barnes* suffered from similar flaws, yet the Sixth Circuit held that they were nevertheless adequate to establish a prima facie case. 896 F.2d at 1468 & n.15. The critical fact there—as here—was that "[t]he discharge decisions were made by persons who had control over all of the division employees, not merely the employees who worked in each plaintiff's group," *id. at 1468*, and thus the statistics shed light on the motivations of the individual who fired the plaintiff.

Third, Inverness contends that the fact that the same individual—Keith Stauffer—hired and fired Siegel within a relatively short time span (less than four years) gives rise to an inference that he did not discriminate against her. *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th

---

[3] This reasoning admittedly smacks of the ecological fallacy, inferring something about the individual plaintiff (*i.e.*, her proficiency) from the average of the entire group of workers considered for the workforce reduction. *See, e.g., Jones v. City of Lubbock*, 730 F.2d 233, 235 (5th Cir. 1984) (Higginbotham, J., concurring) ("This is termed the 'ecological fallacy,' meaning the use of aggregate data in an attempt to explain the actual behavior of individuals."); *Lewis v. Alamance County, N.C.*, 99 F.3d 600, 604 n.3 (4th Cir. 1996) (Luttig, J.) ("'[T]he "ecological fallacy" . . . is the error of attributing the average behavior of voters in a given geographic area (ecological unit) to all voters in that area.'") (alterations in original; citation omitted); *see also* William S. Robinson, *Ecological Correlations and the Behavior of Individuals*, 15 Am. Soc. Rev. 351 (1950), *available at* http://www.jstor.org/stable/2087176?origin=crossref.

Yet regardless of the soundness *vel non* of this reasoning, it seeks to answer the right question in a disparate-treatment claim—*i.e.*, whether the employer singled out the plaintiff for impermissible reasons—and thus does not contradict *Raytheon*.

-6-

Case No. 1:09-CV-01791
Gwin, J.

Cir. 1995) (adopting "'same actor' inference, which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee" because "[f]rom the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job'") (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (second alteration in original)).

Inverness's argument makes this case a close one, but under binding Sixth Circuit precedent, the conflict between Siegel's statistical evidence and the "same actor" inference creates a factual issue for the jury. *See, e.g.*, *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573-74 (6th Cir. 2003) ("Although the factfinder is permitted to draw th[e same-actor] inference, it is by no means a mandatory one, and it may be weakened by other evidence. We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.") (citation omitted). Inverness's attack on Siegel's prima facie case thus fails at the summary judgment stage.

### B. Pretext

In the alternative, Inverness argues that even if Siegel has established a prima facie case sufficient to defeat summary judgment, she has not adduced any evidence that the legitimate, nondiscriminatory reasons that Inverness proffered for her discharge were a pretext for unlawful discrimination. [Doc. 34-1 at 10-14.] As noted above, Inverness's proffered reasons for retaining Kromalic over Siegel in the hospital sales group were Kromalic's superior distributor relationships, more advanced technical knowledge, and greater willingness to travel and work full-time. [Doc. 34-1 at 3.] And Inverness's proffered reason for keeping Deckard, McGinness, and Liptak for the labs

-7-

Case No. 1:09-CV-01791
Gwin, J.

sales group was their experience selling to labs, which Siegel lacked. [Doc. 34-1 at 3.]

The Sixth Circuit has explained that "[a]t the summary judgment stage, the [pretext] issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). The plaintiff has at least three avenues for showing pretext: "(1) that the [employer's] proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Id.* at 400.

Siegel points to two pieces of evidence suggesting that Inverness's proffered reasons did not actually motivate it to terminate her. First, Siegel points to Inverness's shifting justifications for discharging her as evidence of pretext. [Doc. 56 at 15-17.] *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("'An employer's changing rationale for making an adverse employment decision can be evidence of pretext.' Shifting justifications over time calls the credibility of those justifications into question. By showing that the [employer's] justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the [employer's] proffered reason was not only false, but that the falsity was a pretext for discrimination.") (citations omitted). Initially, on October 15, 2007, Inverness circulated a spreadsheet of employees to be terminated, which listed "Core Comp[etency]" as the reason for Siegel's discharge. [Doc. 57-4 at 8.] Then, two days later, Inverness circulated another spreadsheet stating that the reason for Siegel's discharge was "[Inverness] Leadership Characteristics of Strategic and geographic desirability." [Doc. 57-8 at 2-3.] Similarly, shortly after the workforce reduction, Inverness prepared forms assessing its employees' leadership abilities; Siegel's form stated that she "has not effectively demonstrated the ability to influence and lead others towards a decision, common goal, or decisive

-8-

Case No. 1:09-CV-01791
Gwin, J.

action." [Doc. 34-12 at 1.] Finally, in its position statement in response to Siegel's EEOC charge, Inverness, on the basis of supervisors' written performance ratings, asserted the justifications advanced above—namely, relationships with distributors, technical knowledge, willingness to travel and work full-time, and experience selling to labs. [Doc. 52-2 at 4-6.] Although the shift in these justifications (from core competency to leadership characteristics to particular job skills) is by no means enormous, it is sufficient to allow a jury to "reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400 n.4.

Second, as circumstantial evidence of pretext, Siegel argues that Inverness did not enunciate its proffered justification until after it had already decided to terminate her—suggesting that that justification was merely a post hoc rationalization that Inverness concocted to cover up its real discriminatory reasons for terminating her. [Doc. 56 at 16-17.] Inverness admits that it did not complete the written employee performance ratings until after making its workforce reduction decisions. [Doc. 34-1 at 12.] The fact that an employer did not state its proffered reason until after deciding to terminate an employee is evidence that reason was pretextual. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 811-12 (6th Cir. 2007) ("Plaintiff adduced evidence from which a jury could conclude that Defendants' purported legitimate reason was an after-the-fact concoction. . . . Plaintiff . . . put forth evidence suggesting that negative comments regarding his productivity were only added to his personnel file after Defendants made the decision to terminate him.").

In response, Inverness contends that even if a reasonable jury could doubt the credibility of its proffered reasons, no reasonable jury could conclude that its real reason was discrimination. [Doc. 34-1 at 11 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).] But the Sixth Circuit in *Cicero* held that an employer's shifting justifications for the employee's discharge are

-9-

Case No. 1:09-CV-01791
Gwin, J.

evidence of discriminatory animus sufficient to defeat summary judgment. *See* 280 F.3d at 592.[4/]

Inverness also argues that by pursuing gender and "gender plus age" claims, Siegel has admitted that age was not Inverness's sole reason for discharging her—as an ADEA claim requires. *See Gross v. GBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009). But Siegel may pursue alternative claims at this stage of the case; what *Gross* prohibits is an age discrimination verdict based on a mixed-motive jury instruction. *See id.* at 2347-48.

### IV. Siegel's Ohio "Gender Plus Age" Claim

Inverness next argues—and Siegel does not contest—that Ohio Rev. Code § 4112.08 bars her from bringing a state-law civil action for her "gender plus age" claim because she also filed a discrimination charge for that claim with the Ohio Civil Rights Commission. [Doc. 34-1 at 18; Doc. 8-2.] As this Court's earlier opinion denying Inverness's Rule 12(c) motion concluded, Siegel's "gender plus age" claim fell within the scope of her administrative charge. [Doc. 18 at 5-6.] The Court thus grants summary judgment to Inverness on Siegel's Ohio "gender plus age" claim.

### V. Availability of Non-Economic and Punitive Damages

Finally, Inverness moves for summary judgment on Siegel's claims for non-economic and punitive damages. [Doc. 34-1 at 18-20.]

First, because the ADEA does not allow recovery of non-economic or punitive damages, the Court grants summary judgment to Inverness on Siegel's ADEA claim for those types of damages. *See Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 336 (1995). But if Siegel can show at

---

[4/]Inverness argues that *Hicks* requires a plaintiff to prove not only that the employer's proffered reasons for discharging her were pretext, but also that the employer's real reason was discriminatory. [Doc. 34-1 at 11.] But Hicks arose after a full bench trial. 509 U.S. at 506-08. Here, by contrast, Inverness asks for summary judgment, and thus must show that *no reasonable jury* could conclude that its real reason for discharging Siegel was discriminatory—which, per *Cicero*, it has not done.

-10-

Case No. 1:09-CV-01791
Gwin, J.

trial that Inverness's violation of the ADEA was "willful," 29 U.S.C. § 626(b), she may recover liquidated damages—defined as double her unpaid wages. *See* id. (incorporating 29 U.S.C. § 216(b)'s definition of liquidated damages).

Second, Inverness argues that Siegel may not recover punitive damages under Title VII or Ohio law because she has not adduced any evidence that Inverness acted with malice or reckless indifference. [Doc. 34-1 at 19-20.] *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999); *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1220 (Ohio 1999).[5/] But this argument fails for the same reason that Inverness's attack on Siegel's prima facie case fails: A reasonable jury, looking at the adverse impact statistics of Inverness's workforce reduction, could find that Inverness intentionally discriminated against Siegel on impermissible grounds. That finding of intentional discrimination would support a punitive damages award; Inverness does not contend here that its conduct falls into one of the exceptions to punitive damage liability. *See Kolstad*, 527 U.S. at 536-37 ("There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this [malice or reckless indifference] standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.").

---

[5/]Inverness, citing *Ridley v. Federal Express*, No. 82904, 2004 WL 1119591 (Ohio Ct. App. May 20, 2004), argues that Ohio law bars punitive damages absent "egregious" conduct. But *Ridley* restated the *Rice* standard that punitive damages are available if the defendant acted with "actual malice"—*i.e.*, intentional disregard of the employee's right to be free from discrimination. *Id.* at ¶ 86.

Case No. 1:09-CV-01791
Gwin, J.

Finally, Inverness argues that punitive damages are unavailable because any discriminatory animus by Inverness's managers towards Siegel was contrary to Inverness's good-faith efforts to comply with anti-discrimination laws—namely, the disparate-impact reviews that it prepared after the workforce reduction. [Doc. 34-1 at 19.] But Siegel, pointing to Inverness's shifting justifications for Siegel's termination, contends that those disparate-impact reviews were a post hoc justification for its discriminatory decision. [Doc. 56 at 20.] Thus, whether Inverness's disparate-impact reviews constituted a good-faith effort to comply with Title VII's prohibition on disparate treatment is a question for the jury.

### VI. Conclusion

For the reasons above, the Court GRANTS IN PART and DENIES IN PART Inverness's summary judgment motion. In particular, the Court DENIES Inverness's motion for summary judgment on Siegel's disparate-treatment claims under federal and state law, except that the Court GRANTS Inverness's motion for summary judgement on Siegel's state-law "gender plus age" claim. Additionally, the Court GRANTS Inverness's motion for summary judgment on Siegel's claim for non-economic and punitive damages under the ADEA, but DENIES Inverness's motion for summary judgment on Siegel's other claims for punitive damages.

IT IS SO ORDERED.

Dated: May 14, 2010        s/    *James S. Gwin*
                           JAMES S. GWIN
                           UNITED STATES DISTRICT JUDGE